# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICK COLLINS, an individual, and VETERANS 360, a California Corporation,<br><br>                              Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF VETERANS AFFAIRS,<br><br>                              Defendant. | Case No.: 19-cv-00867-H-MSB<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 32.] |

On May 9, 2019, Plaintiffs Rick Collins and Veterans 360 ("Plaintiffs"), filed a complaint against the U.S. Department of Veterans Affairs ("Defendant"), asserting claims for trademark infringement. (Doc. No. 1.) On September 4, 2020, Defendant filed a motion for summary judgment. (Doc. No. 34.) On September 29, 2020, Plaintiffs filed a response in opposition to Defendant's motion. (Doc. No. 33.) On October 6, 2020, Defendant filed a reply. (Doc. No. 25.) The Court held a telephonic hearing on the matter

on October 26, 2020, at 10:30 am.  Glenn Trost and Donald Wenskay appeared for Plaintiffs.  Scott Bolden and Rebecca Church appeared for Defendant.  For the reasons that follow, the Court grants Defendant's motion for summary judgment.

## Background

In 2011, Plaintiff Rick Collins ("Collins") took over a non-profit called Returning Patriots Corporation and renamed it Veterans 360 in 2012. (Doc. No. 33-1, Collins Decl. ¶ 4.) Veterans 360 provides support services to veterans and their families. (Doc. No. 32-3, Ex. 1, at NOL 5-8.; see also Doc. No. 33-1, Collins Decl. ¶ 4.) Veterans 360 has a board of directors comprised of three members. (Doc. No. 32-3, Bolden Decl., Ex. 1 at NOL 4.) Scott Attenborough was the chairman of Veterans 360's board from 2015 to 2018. (See Doc. No. 32-3, Bolden Decl., Ex. 3 at NOL 33.)  Over the years, Veterans 360 has participated in volunteer events to support combat veterans, "sponsored healing events . . . to promote emotional healing for combat veterans," worked with command personnel and other veterans-related organizations, helped veterans and their families get financial support, and assisted veterans in finding housing and employment. (Doc. No. 33-1, Collins Decl. ¶¶ 7-19.)

Collins served as Veterans 360's executive director and lone employee. (Doc. No. 32-3, Bolden Decl., Ex. 1 at NOL 4-5.)  Collins acted as the "primary and only point of contact" for Veterans 360 and provided one-to-one services to veterans on its behalf. (Doc. No. 32-3, Bolden Decl., Ex. 7, at NOL 93.)  Outside of Collins, Veterans 360 relied on the work of volunteers, such as veterans Demarcus Reed, Jordan Marks, and Theophilus Tor. (See id. at NOL 89-91.)  According to Veterans 360's tax returns, from 2014 to 2017, the organization had total revenues of over $370,000, had total expenses totaling over $340,000, and spent just under $2,500 on advertising. (Doc. No. 32-3, Bolden Decl., Exs. 12-15, at NOL 228-61.)

"Veterans 360 does business using both the Veterans 360 and the Vets 360 trademarks, somewhat interchangeably, and [Collins] sometimes use[s] Vets 360 to refer to the Veterans 360 organization." (Doc. No. 33-1, Collins Decl. ¶ 6.)  May 30, 2015,

Plaintiffs sought to register "VETERANS 360" as a trademark, (Doc. No. 32-3, Bolden Decl., Ex. 9, at NOL 114), and the United States Patent and Trademark Office ("USPTO") issued registration for the mark on July 5, 2016, (id. at NOL 152). In the application, Plaintiffs asserted that the mark was first used in commerce on August 15, 2012, (id. at NOL 114), and submitted a copy of the following logo:



(id. at NOL 122-23). While the trademark the USPTO issued states that it protected the mark in "standard characters without claim to any particular font, style, size, or color," (id. at NOL 152), Collins explained in his deposition that Plaintiffs used the depicted logo "[e]verywhere," including on "T-shirts, business card[s], [its] website, [and] email signatures," (Doc. No. 32-3, Bolden Decl., Ex. 7, at NOL 94).

In 2016, Defendant's Veteran's Experience Office ("VEO") proposed the development of an internal information technology system to improve the consistency of veteran data across Defendant's various databases. (Doc. No. 17-2, Prietula Decl., ¶¶ 4-6.) According to Laura Prietula, the VEO's Deputy Director for Multichannel Technologies, this system was aimed at "ensuring that [veterans] have a consistent experience with the VA—e.g. by only having to update their demographic data in one database and having it automatically updated in all related databases." (Id. ¶ 6.) Prietula confirmed in a declaration submitted earlier in this case and at her deposition that this is an internal system used by Defendant and its partners; veterans do not interact with it directly. (Id.; Doc. No. 32-3, Bolden Decl., Ex. 4, at NOL 43-44.) While internally in 2016 Defendant referred to this system in at least one document as "Veteran360," (Doc. No. 33-8, Trost Decl., at 4), Defendant referred to this system more frequently as "Vet360," (Doc. No. 32-3, Bolden Decl., Ex. 4, at NOL 43).

In 2017, Plaintiffs began developing the Connect app, (id. at NOL 104), which was a smartphone application made to help veterans with "transition and health & wellness challenges," (Doc. No. 32-3, Bolden Decl., Ex. 16, at NOL 262).  In late 2017, Collins sent an email informing those involved with Veterans 360 that, going into 2018, his "focus is 100%, as it relates to Vets 360, around CONNECT."  (Doc. No. 32-3, Bolden Decl., Ex. 17, at NOL 265.)  Shortly thereafter, he sent another email confirming that he "migrated most everything to [t]he CONNECT App instead of Veterans 360."  (Doc. No. 32-3, Bolden Decl., Ex. 18, at NOL 267.)  In his deposition, Collins stated that, while he continued to use the Veterans 360 and Vets 360 names, he "did not continue to advertise [Veteran 360's] services outside of the services that were all built into the Connect app, which was [the] primary focus at that time."  (Doc. No. 32-3, Bolden Decl., Ex. 7, at NOL 104.)  Sometime in 2018, Attenborough stepped down from Veterans 360's board.  (See Doc. No. 32-3, Bolden Decl., Ex. 3, at NOL 33.)  In his deposition, he explained that he was "backing off" as Collins was "transitioning to" the new Connect app.  (Id.)  Plaintiffs ultimately did not complete the Connect app project. (Doc. No. 33-1, Collins Decl. ¶ 28.) Later in 2018, Collins founded another organization, S.A.F.E., which teaches situational awareness to children.  (Doc. No. 32-3, Bolden Decl., Ex. 1, at NOL 5-6.)

In April 2018, Defendant introduced its Vet360 system to the public.  (See Doc No. 17-2 ¶ 7.)  Shortly thereafter, Collins sent an email to his Veterans 360 constituents, stating the following:

> The VA, yes the VA has infringed on our trademark Veterans 360 and we have a great case to receive some compensation for it!!!
> . . .
> While I decide who to go with I got some sage advise [*sic*]. Expand the protection that Veterans 360 gives me by adding Vets 360, Vet 360 and Veteran 360 so I have all derivatives—singular and plural covered.

(Doc. No. 32-3, Bolden Decl., Ex. 21, at NOL 276.)  The next day, on May 10, 2018, Collins sent an application to trademark "VETS 360" to the USPTO, in which he also asserted that the mark was used in commerce since 2012.  (Doc. No. 32-3, Bolden Decl.,

1  Ex. 10, at NOL 154; see also Doc. No. 33-1, Collins Decl. ¶ 6 (describing how his
2  organization used these terms interchangeably).)  The USPTO issued registration for the
3  mark on January 15, 2019.  (Doc. No. 32-3, Bolden Decl., Ex. 10, at NOL 225.)

4        On May 26, 2018, and then again on June 26, 2018, Plaintiffs sent a letter to
5  Defendant, informing Defendant of their potential trademark infringement claims.  (Doc.
6  No. 33-5 to -6, Trost Decl., Exs. C, D.)  Defendant did not respond to either letter, (Doc
7  No. 33-1, Collins Decl., ¶ 27), prompting Plaintiffs to file a complaint with this Court, in
8  which Plaintiffs alleged claims for trademark infringement pursuant to 15 U.S.C. § 1114,
9  (Doc. No. 1 ¶¶ 10-13).  On December 31, 2019, Defendant voluntarily rebranded its Vet360
10 system, changing the name to VA Profile.  (Doc. No. 32-3, Bolden Decl., Ex. 4, at NOL
11 55.)  By the present motion, and after the close of discovery, Defendant moves for summary
12 judgment on Plaintiffs trademark infringement claims and, in the alternative, for partial
13 summary judgment on the grounds that Plaintiffs' cannot prove they are entitled to
14 damages.  (Doc. No. 32 at 1.)

15                              **Discussion**

16 **I.    Standard of Review**

17       Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil
18 Procedure if the moving party demonstrates that there is no genuine issue of material fact
19 and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp.
20 v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing
21 substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc.,
22 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.,
23 Inc., 618 F.3d 1025, 1031 (9th Cir. 2010).  "A genuine issue of material fact exists when
24 the evidence is such that a reasonable jury could return a verdict for the nonmoving party."
25 Fortune Dynamic, 618 F.3d at 1031 (internal quotation marks and citations omitted);
26 accord Anderson, 477 U.S. at 248.  "Disputes over irrelevant or unnecessary facts will not
27 preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors
28 Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case that the nonmoving party bears the burden of proving at trial. Id. at 322-23; Jones v. Williams, 791 F.3d 1023, 1030 (9th Cir. 2015). Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e)); accord Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007). To carry this burden, the non-moving party "may not rest upon mere allegation or denials of his pleadings." Anderson, 477 U.S. at 256; see also Behrens v. Pelletier, 516 U.S. 299, 309 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings."). Rather, the nonmoving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor." Anderson, 477 U.S. at 256.

When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). The court should not weigh the evidence or make credibility determinations. See Anderson, 477 U.S. at 255. "The evidence of the non-movant is to be believed." Id. Further, the Court may consider other materials in the record not cited to by the parties, but it is not required to do so. See Fed. R. Civ. P. 56(c)(3); Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).

**II.  Liability under the Lanham Act**

The Lanham Act, 15 U.S.C. § 1051 et seq., "creates a comprehensive framework for regulating the use of trademarks and protecting them against infringement, dilution, and unfair competition." Gordon v. Drape Creative, Inc., 909 F.3d 257, 263 (9th Cir. 2018) (quoting Fortune Dynamic, 618 F.3d at 1030). To show trademark infringement, Plaintiffs

must prove: (1) that they have "a valid, protectable trademark" and (2) the "defendant's use of the mark is likely to cause confusion." Id. (quoting S. Cal. Darts Ass'n v. Zaffina, 762 F.3d 921, 929 (9th Cir. 2014)). In this case, only the likelihood of confusion element is at issue. (See Doc. No. 32 at 11 n.1.) Defendant contends that it is entitled to summary judgment because Plaintiffs cannot prove that its Vet360 system was likely to cause confusion with Plaintiffs' marks. (Doc. No. 32 at 14.)

### A. Likelihood of Confusion

"The 'likelihood of confusion' inquiry generally considers whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing one of the marks or names at issue in the case." Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, 1209 (9th Cir. 2012). To determine whether another party's use of a mark is likely to cause confusion, the courts consider eight non-exhaustive factors:

> (1) the strength of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines.

Gordon, 909 F.3d at 264 n.6 (internal citations omitted). These factors are often dubbed the Sleekcraft factors. Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1053-54 (9th Cir. 1999). The Ninth Circuit has made clear that these factors are pliable and should be applied in a case-specific manner. Id. at 1054; see also Rearden, 683 F.3d at 1209 ("A determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances.").

The Court is cognizant of the fact that the Ninth Circuit has cautioned district courts to grant summary judgment on the issue of likelihood of confusion "sparingly." Fortune Dynamic, 618 F.3d at 1039; see also Rearden, 683 F.3d at 1210 ("Given the open-ended nature of this multi-prong inquiry, it is not surprising that summary judgment on

'likelihood of confusion' grounds is generally disfavored."). Despite this, summary judgment is still proper in trademark infringement cases where, as here, no genuine issue of material fact exists. Surfvivor Media, Inc. v. Survivor Prods., 406 F.3d 625, 630 (9th Cir. 2005).

### 1.    Strength of the Mark

The Court first turns to the strength of the mark factor. "The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." Brookfield, 174 F.3d at 1058. The strength of a mark is "evaluated in terms of its conceptual strength and commercial strength." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1207 (9th Cir. 2000).

### i.    Conceptual Strength

"A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which it refers." Fortune Dynamic, 618 F.3d at 1032-33. From weakest to strongest, marks are conceptually categorized as generic, descriptive, suggestive, and arbitrary or fanciful. Id. (citing GoTo.com, 202 F.3d at 1207). Suggestive, arbitrary, or fanciful marks are automatically protectable. S. California Darts Ass'n v. Zaffina, 762 F.3d 921, 929 (9th Cir. 2014). Descriptive marks are protectable if they acquire a secondary meaning by becoming distinctive "as used or in connection with the applicant's goods in commerce." Id.

"Categorizing trademarks is necessarily an imperfect science," particularly, as here, when the object is to determine whether a mark is descriptive or suggestive. Fortune Dynamic, 618 F.3d at 1033 ("The line between descriptive and suggestive marks is nearly incapable of precise description."). On the one hand, descriptive marks "describe[] the qualities or characteristics of a good or service." Id. (alteration in original) (citation omitted). On the other hand, suggestive marks "require a consumer to 'use imagination or any type of multistage reasoning to understand the mark's significance.'" Id. (citing Zobmondo Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1114 (9th Cir. 2010)).

In this case, the parties disagree as to whether the term "360" is used in a descriptive or suggestive manner in Plaintiffs' marks.[1] Defendant argues that the term is descriptive because it describes the organization's services as "full circle" or "comprehensive." (Doc. No. 35 at 5.) On the other hand, Plaintiffs argue that the term 360 is suggestive because it their organization does not "sell a '360'"; rather, 360 suggests that they provide comprehensive support to veterans they work with. (Id.)

The term 360, as used in Plaintiffs' marks, is suggestive. See Fortune Dynamic, 618 F.3d at 1033. Although one need not have a substantial amount of imagination to make the inference that 360 is intended to mean comprehensive, this inference is still required nonetheless. In fact, a district court in the District of Massachusetts found that the term 360 was suggestive in another case for this very reason: "one must remember that 360 is the number of degrees in a circle, somehow connect that circle to movement, and imagine that the mark relates to pivotability of the shoe." Tanel Corp. v. Reebok Int'l, Ltd., 774 F. Supp. 49, 51 (D. Mass. 1990).

Plaintiffs' trademarks are still conceptually weak. To start, suggestive marks "are presumptively weak." See Brookfield, 174 F.3d at 1058. Further, the term 360 is used ubiquitously: there are "thousands of other registered and asserted trademarks" that use the term 360 as a component. (Doc. No. 33 at 16; see also Doc. No. 17-3 at 48-49.) This in turn re-affirms the presumption that Plaintiffs' marks are conceptually weak. See One Indus., LLC v. Jim O'Neal Distrib., 578 F.3d 1154, 1164 (9th Cir. 2009) ("When similar marks permeate the marketplace, the strength of a mark decreases."); Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1144 (9th Cir. 2002) ("[T]hat the marketplace is replete with products using a particular trademarked word indicates not only the difficulty in avoiding its use but also, and directly, the likelihood that consumers will not be confused by its use."); see also Fortune Dynamic, 618 F.3d at 1032-33 (explaining that the more "obvious[]" the connection between the term and the good or service is, the less

---

[1] The parties do not appear to dispute whether the terms "Veterans" or "Vets" are descriptive.

conceptually strong the term is).

### ii. Commercial Strength

Nevertheless, a conceptually weak mark may be strengthened if it has attained "actual marketplace recognition." Id. (citation omitted). "[A]dvertising expenditures can transform a suggestive mark into a strong mark." Id. (citation omitted). Evidence showing that a mark has been exclusively used by the plaintiff for a long period of time or that the mark has attained public recognition can also demonstrate the mark's commercial strength. Accuride Int'l, Inc. v. Accuride Corp., 871 F.2d 1531, 1536 (9th Cir. 1989).

In this case, the fact that Plaintiffs only used the marks for a few years and spent minimal financial resources in advertising the marks cuts against Plaintiffs on this factor. From 2014 to 2017, Veterans 360 spent a little under $2,500 on advertising in total, which comprised less than one percent of its total expenses over that period. (Doc. No. 32-3, Bolden Decl., Exs. 12-15, at NOL 228-61.) These small expenditures over the course of just a few years generally would not be enough to show that the marks had "actual marketplace recognition." See, e.g., Brookfield, 174 F.3d at 1058 (holding district court did not err when it classified the plaintiff's mark as weak at preliminary injunction stage despite the plaintiff's use of the mark for five years and expenditures of over $100,000 in advertising); Entrepreneur, 279 F.3d at 1144 (finding weak descriptive mark not strengthened on summary judgment despite mark's use in over half a million magazine copies over the course of over twenty years).

Given Plaintiffs' target market and its financial circumstances, however, conventional marketing expenses may not be completely illustrative the commercial strength of Plaintiffs' marks. Plaintiffs' target market, veterans and their families, is much smaller than the consumer public at large. Thus, it is possible that Plaintiffs' efforts in organizing volunteer and healing events, partnering with various other veterans' groups, and so forth, could have garnered sufficient public recognition for their marks among veterans. That being said, the impact of these efforts is likely somewhat undermined by Plaintiffs' shift away from the marks at issue in this litigation in 2017 towards the Connect

app. (See Doc. No. 32-3, Bolden Decl., Ex. 7, at NOL 104 (stating that Connect app was "primary focus"); Ex. 16 at NOL 262 (detailing the transition to smartphone application); Ex. 17 at NOL 265 (stating intentions to focus "100%" of effort on Connect app); Ex. 18 at NOL 267 (confirming migration to Connect app)).

In summary, Plaintiffs' marks are conceptually weak because they are only mildly suggestive and are similar to numerous other marks that use the term 360 as a component. Thus, some confusion in the marketplace "might be expected." Dreamwerks Prod. Grp., Inc. v. SKG Studio, 142 F.3d 1127, 1130 (9th Cir. 1998). Moreover, Plaintiffs have only used the marks for a relatively short period of time, expended less than one percent of their total expenses on advertising these marks, and at least temporarily subordinated their use of their marks in favor of the Connect app. Nonetheless, because a jury may conclude that its marks gained public recognition in the veteran community, this factor weighs in favor of Plaintiffs. See Scott, 550 U.S. at 378 (explaining that, on summary judgment, a court must resolve all inferences in the nonmoving party's favor).

### 2. Similarity of the Marks

The Court then turns to the similarities of the parties' marks. "Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." GoTo.com, 202 F.3d at 1206. The Ninth Circuit has developed "three axioms that apply to the 'similarity' analysis: 1) Marks should be considered in their entirety and as they appear in the marketplace; 2) Similarity is best adjudged by appearance, sound, and meaning; and, 3) Similarities weigh more heavily than differences." Entrepreneur, 279 F.3d at 1144. The Ninth Circuit's decision in Surfvivor Media, Inc. v. Survivor Prods., 406 F.3d 625 (9th Cir. 2005), is instructive to the resolution of this factor. In Surfvivor, the Ninth Circuit also dealt with marks that differed by only one letter and had phonetic similarities, "Surfvivor" versus "Survivor." Id. at 629, 633. The Ninth Circuit held that, despite these similarities, this factor was neutral because the Survivor mark was generally accompanied by a stylized graphic containing a distinctive slogan. Id. at 633.

The facts in this case are practically identical to those in Surfvivor. Defendant does

not dispute that their marks are similar to Plaintiffs' marks in sound and appearance in plain-text form. (See Doc. No. 35 at 6.) After all, the only abstract difference between the marks in dispute in this case is that one set of marks is singular and the other is plural. These similarities weigh in favor of Plaintiffs on this issue. See GoTo.com, 202 F.3d at 1206. On the other hand, however, the parties' marks are dissimilar as usually displayed in commerce. The following is a depiction of Plaintiffs' logo and Defendant's use of the Vet360 name in one of its announcements, side-by-side:



(Doc No. 17-2 at 5 (for the image on the right); Doc. No. 32-3, Bolden Decl., Ex 9, at NOL 122 (for the Veterans 360 logo).) As one can see, the parties use different colors and stylizations, and incorporate different graphics in conjunction with their marks. These differences cut against Plaintiffs. Thus, as in Surfvivor, this factor is neutral. 406 F.3d at 633.

### 3. Relatedness or Proximity of the Services

With respect to the third factor, "[t]he more closely related the [parties' services] . . . , the more likely consumers will be confused by similar marks." Entrepreneur, 279 F.3d at 1147. To determine proximity or relatedness, courts look to whether the services (1) are "complementary," (2) share the "same class" of consumers, and (3) "are similar in use and function." Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1150 (9th Cir. 2011) (citing Sleekcraft Boats, 599 F.2d at 350). "[T]he mere fact that two products or services fall within the same general field . . . does not mean that the two products or services are sufficiently similar to create a

likelihood of confusion." Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha, 290 F. Supp. 2d 1083, 1092 (C.D. Cal. 2003) (omission in original) (internal quotation marks omitted) (citation omitted); see also Mach. Head v. Dewey Global Holdings, Inc., 61 U.S.P.Q.2d 1313, 1318 (N.D. Cal. 2001) ("The fact that both products could broadly be described as relating to music is not sufficient to find that the products have a similar use or function.").

Here, the services Defendant provided using the Vet360 system were not proximate to Plaintiffs' services. Although both parties provide veterans with "housing, job-placement, job-training, and mental health services," (Doc. No. 33 at 11), the services associated with the marks at issue were not provided to the same class of people. Plaintiffs used their marks in conjunction with veterans' wellness services that involved direct interactions with veterans and those in the veteran community, (see Doc. No. 33-1, Collins Decl. ¶ 6), whereas Defendant's Vet360 system was an internal profile management database used to improve data consistency that "[v]eterans [did] not directly interact with," (Doc. No. 17-2, Prietula Decl., ¶¶ 4-6). Thus, because the services provided using the marks are distinct in function and are intended for different classes of users, this factor favors Defendant.

### 4. Evidence of Actual Confusion

The Court then turns to Plaintiffs' evidence of actual confusion. "[E]vidence of actual confusion, at least on the part of an appreciable portion of the actual consuming public, constitutes strong support for a 'likelihood of confusion' finding." Rearden, 683 F.3d at 1209 (citation omitted). The key inquiry is therefore whether there is evidence to support a jury finding that an "appreciable" number of people would be confused about the source of a product or service. See id.; Entrepreneur, 279 F.3d at 1151. "De minimis evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding likelihood of confusion . . . ." Mattel, Inc. v. MCA Records, Inc., 28 F. Supp. 2d 1120, 1149 (C.D. Cal. 1998) (omission in original) (citation omitted), aff'd, 296 F.3d 894 (9th Cir. 2002); see also Surfvivor, 406 F.3d at 633 (finding "scant evidence of

actual confusion in record" not in favor of summary judgment).

Plaintiffs argue that they have proffered enough evidence of confusion to avoid summary judgment. In particular, Plaintiffs point to four specific individuals who claim to have been confused by Defendant's Vet360 profile. Collins submitted a declaration stating that an individual named Dean Dauphinais, who operates a charity for homeless veterans, asked Collins whether he had a relationship to the Defendant. (Doc. No. 33-1, Collins Decl., ¶ 24.) Moreover, Plaintiffs submitted declarations from three of their volunteers, Demarcus Reed, Jordan Marks, and Theophilus Tor, who each likewise inquired about Plaintiffs' relationship to Defendant's Vet360 system. (Doc Nos. 16-3 to-5, Reed Decl., ¶ 5; Marks Decl., ¶ 4; Tor Decl., ¶ 5.)

However, only four incidents of reported confusion in the time span between Defendant's announcement of its Vet360 system and its voluntary rebranding is not sufficient to support a finding that an "appreciable" number of people were likely to be confused. See, e.g., Cohn v. Petsmart, Inc., 281 F.3d 837, 843 (9th Cir. 2002) (upholding summary judgment and discounting "several dozen inquiries over the years about whether the parties were related" because they were "too ambiguous"); Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F. Supp. 2d 1023, 1053-54 (C.D. Cal. 2013) ("[E]ight examples of potential consumer confusion in the record do not support a finding that any appreciable number of consumers is confused . . . ."); see also (5th ed.) ("The better view is that while enquiry evidence is admissible and relevant, standing alone with no other evidence it is insufficient proof of actual confusion."). Moreover, Plaintiffs' evidence is even less probative of confusion considering that Plaintiffs never allege that Dauphinais is a veteran, (see Doc. No. 33-1, Collins Decl., ¶ 24), and the other three declarants all volunteered for Veterans 360 and are Collins' friends, (see Doc. No. 33-2 Ex. 7 at NOL 89, 91-91, 99). See Walter v. Mattel, Inc., 210 F.3d 1108, 1111 (9th Cir. 2000) (disregarding reports of confusion when they "do not reflect the views of the purchasing public"); Stonefire Grill, 987 F. Supp. 2d at 1054 (same). The Court also notes that Plaintiffs do not offer any survey evidence or expert witness testimony to support their claims that an appreciable number of

people have been or are likely to have been confused. That being said, "because actual confusion is hard to prove," and its "absence [is] generally unnoteworthy," Brookfield, 174 F.3d at 1050, this factor only slightly favors Defendant.

### 5. Likelihood of Expansion[2]

A plaintiff must show a "strong possibility of [the defendant's] expansion into competing markets" for this factor to favor infringement. M2 Software, Inc. v. Madacy Entm't, 421 F.3d 1073, 1085 (9th Cir. 2005) (citation omitted). In this case, Plaintiffs have not produced evidence to show that either party is likely to expand into competing markets. In fact, Defendant rebranded its service and no longer uses the Vet360 name. (Doc. No. 32-3, Bolden Decl., Ex. 4, at NOL 55.) Moreover, as the Court has discussed earlier in this Order, Plaintiffs de-emphasized their focus on the marks at issue beginning in 2017, pivoting their efforts towards the Connect app and elsewhere. Accordingly, this factor heavily favors Defendant.

### 6. Defendant's Intent in Selecting the Mark

The Court next turns to the intent factor. "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." Entrepreneur Media, 279 F.3d at 1148 (citation omitted). This factor is generally of "minimal importance," GoTo.com, 202 F.3d at 1208, unless "it bears upon the likelihood that consumers will be confused by the alleged infringer's mark (or to the extent that a court wishes to consider it as an equitable consideration)," Brookfield, 174 F.3d at 1059.

Plaintiffs argue that the intent factor favors them. (Doc. No. 33 at 12.) Plaintiffs first argue that Defendant announced its new Vet360 system with actual knowledge of their Veterans 360 mark. (Id.) Also, Plaintiffs contend that even if Defendant did not have

---

[2] The Ninth Circuit has explained that this factor has little relevance when the services or goods in dispute are "closely related." Playboy Enter., Inc. v. Netscape Commc'ns Corp., 354 F.3d 1020, 1029 (9th Cir. 2004). However, because the Court resolved the relatedness factor in favor of Defendant, this factor is relevant here. Cf. id.

actual knowledge of the Veterans 360 mark, "a two-minute search of the USPTO website would have revealed" their registered Veteran 360 mark. (Id.) Further, Plaintiffs contend that this factor also favors them because Defendant did not change the name of the Vet360 system after Plaintiffs sent Defendant letters that put it on notice of the registered marks. (Id.)

None of Plaintiffs arguments are persuasive. First, Plaintiffs' contentions that Defendant willfully used their marks are conclusory and unsupported by evidence indicating that those who adopted the Vet360 name knew of Plaintiffs' marks at the time they adopted it. Second, merely stating that Defendant could have conducted a trademark registry search and discovered Plaintiffs' marks does not make this factor favor Plaintiffs. See Brookfield, 174 F.3d at 1059 (emphasizing that intent is only relevant insofar as it demonstrates an intent to confuse consumers); Stonefire Grill, 987 F. Supp. 2d at 1055. Third, Plaintiffs' attempt to attribute intent to Defendant by its refusal to change the name of its Vet360 system immediately upon receipt of their letters is misguided because "the failure to stop using a mark after receiving a cease and desist letter does not show willful infringement and is 'not necessarily indicative of bad faith.'" Matrix Motor, 290 F.Supp.2d at 1096; see also Groupion, LLC v. Groupon, Inc., 826 F. Supp. 2d 1156, 1165 (N.D. Cal. 2011) (same). Accordingly, Plaintiffs cannot demonstrate Defendant's intent. That being said, because this factor is generally of minimal importance, GoTo.com, 202 F.3d at 1208, this factor only slightly favors Defendant.

### 7. Marketing Channels and Degree of Care

With respect to the remaining two factors, the parties agree that both marketing channels and the degree of care factors, respectively, are neutral. (Compare Doc. No. 32 at 21-22, with Doc. No. 33 at 8 n.5.) Thus, the Court affords these factors little weight.

### B. Summary of the Likelihood of Confusion Test

The Court commends Plaintiffs for their organization and the public services they provide. However, considering the aforementioned factors and the totality of the circumstances in this case, Plaintiffs have not provided sufficient evidence to support a

jury finding that it is "probable" that Defendant's use of Plaintiffs' mark is "likely to confuse an appreciable number of people." M2 Software, 421 F.3d at 1085 (citations omitted).  Thus, Plaintiffs have failed to demonstrate a triable issue of material fact as to a necessary element of their trademark infringement claims.  See Surfvivor Media, 406 F.3d at 634 (finding the "distribution of the Sleekcraft factors d[id] not raise a material issue of fact regarding likelihood of confusion" for suggestive mark when only two factors favored the plaintiff); M2 Software, 421 F.3d at 1081-83, 1085 (holding district court did not err in granting summary judgment when the strength of the mark, the similarity of the mark, and the proximity of the goods factors all favored plaintiff because the others favored defendant); cf. Fortune Dynamic, 618 F.3d at 1039 (explaining that summary judgment should not be granted when "a majority of the Sleekcraft factors could tip in either direction").  The Court, therefore, grants Defendant's motion for summary judgment on the grounds that Plaintiffs cannot prove that Defendant is liable for trademark infringement.[3]  Accordingly, the Court need not address the issue of damages.[4]

## Conclusion

For the reasons above, the Court grants Defendant's motion for summary judgment. The Court directs the Clerk to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

DATED: October 27, 2020

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

[3] Defendant's various evidentiary objections are sustained where valid and are otherwise overruled.
[4] Plaintiffs also seek injunctive relief in this case.  Any request for injunctive relief would be for the Court to decide.  Based on the present record, which is fully developed with discovery closed, it does not appear that injunctive relief is warranted.  Nonetheless, the Court need not decide this issue at this juncture.